# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.   '22  MJ2041 |
| Instagram user Account "djokovic_11" | ) | |
| (Target Account #1) | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1591, 2422 | Attempted Sex Trafficking of Children or by Force, Fraud or Coercion Attempted Enticement of a Minor |

The application is based on these facts:

See attached Affidavit of HSI Special Agent Aron Marcellus.

☑ Continued on the attached sheet.

❏ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Aron Marcellus, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 06/03/2022 _____

_____
*Judge's signature*

City and state:  San Diego, California

Honorable Michael S. Berg
*Printed name and title*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>AFFIDAVIT</u>

I, Aron Marcellus, Special Agent with Homeland Security Investigations ("HSI"), having been duly sworn, hereby state as follows:

## INTRODUCTION

1.     I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) for information associated with a certain Instagram account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), an electronic communications service and/or remote computing service provider headquartered at 1601 Willow Road in Menlo Park, California.   As described further in Attachments A-1 and A-2, this request is made to search the following Instagram user Accounts (collectively referred to herein as the "**Target Accounts**") for items that constitute evidence, fruits, and instrumentalities of violations of federal law, namely, 18 USC §1591 (Attempted Sex Trafficking of Children or by Force, Fraud or Coercion) and 18 U.S.C §2422 (Attempted Enticement of a Minor), as more fully described in Attachment B, for the time period from November 14, 2021 up to and including January 14, 2022 for the **Target Accounts**:

        a.  djokovic_11

          ("**Target Account #1**")

        b.  wtgfrfr_11

          ("**Target Account #2**")

2.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1591 and 2422 have been committed by Keenon GREEN ("GREEN").   There is also probable cause to believe that a search of the **Target Accounts** as described in Attachments A-1 and A-2 will produce evidence, fruits and/or instrumentalities of the aforementioned crimes, as described in Attachments B-1 and B-2.

3.     The information set forth in this affidavit is based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of obtaining a search warrant for the **Target Accounts**, it does not set forth each and every fact that I or others have learned during the course of this investigation, but only contains those facts believed to be necessary to establish probable cause.

## EXPERIENCE AND TRAINING

4.     I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Titles 18 and 21 of the United States Code.

5.     I am a Special Agent (SA) employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I am a graduate of the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia and I have been employed as a SA since September 2017. I have been trained to conduct criminal investigations for multiple violations of federal and state laws including, but not limited to alien smuggling and narcotics smuggling, human trafficking, weapons trafficking, and organized criminal activity.  I am currently assigned to the Border Enforcement Security Task Force (BEST), Human Smuggling/Trafficking Group specializing in a variety of criminal and financial investigations. My primary responsibilities include investigating human smuggling/ trafficking and narcotics violations. These investigations include, but are not limited to, investigations involving wire fraud, money laundering, financial crimes, and bulk cash smuggling.

6.      Prior to being a SA with HSI, I was a Supervisory U.S. Border Patrol Agent (SBPA) with U.S. Customs and Border Protection (CBP) from April 2017 to September 2017 and a U.S. Border Patrol Agent (BPA) from February 2008 to March 2017.  As a BPA I conducted law enforcement field operations, interviews, made arrests and prepared administrative and criminal cases related to the violation of immigration and narcotics laws.

7.      Since October 2019, I have been assigned to the San Diego Human Trafficking Task Force (SDHTTF) where I have participated in investigations involving the exploitation of children and adults for illicit commercial sex activity, human trafficking, forced labor, various illegal activity of criminal gang members and have performed a variety of related investigative tasks.

8.      I have become familiar with Instagram and other social media sites through my investigations.  I have examined many Instagram accounts and I have learned that suspects often use social media sites for communications in an effort to bypass law enforcements attempts to uncover their criminal activity. Based on my training, experience, and communications with other law enforcement officers, I have learned specific techniques in being able to identify suspects and associates even when they use fictitious names or aliases within social media sites. Through my training, experience, and consultation with other law enforcement officers, I have learned that:

a.      Individuals involved in illicit commercial sex maintain records, including electronic files, related to their illicit business on computers and computer servers hosting internet applications such as electronic mail (email) and personal social networking web pages;

b.      Individuals involved in illicit commercial sex maintain records of correspondence relating to client contact information as well as travel and lodging arrangements involved in such illegal activity;

c.     Individuals involved in illicit commercial sex maintain documents and files containing names of associates and/or coconspirators involved in prostitution;

d.     Individuals involved in illicit commercial sex maintain financial records, bank statements, money orders, money order receipts, and cash that are evidence of payments made in conjunction with prostitution;

e.     Individuals involved in illicit commercial sex use social media sites like Instagram to find clients and prostitutes.  They use Instagram messaging applications to communicate with prostitutes and customers to increase their mobility and coordinate illicit activities.  They will often use multiple social media accounts in order to maintain contact with other pimps, prostitutes, complicit businesses, and clients.  These social media accounts contain electronic data concerning instant messaging, electronic mail and social media addresses of co-conspirators and clients, as well as contact information for co-conspirators and clients.  Individuals involved in illicit commercial sex also utilize social media to store and display, commonly known as posting, photographs, videos, and text of themselves as well as other coconspirators for the purpose of electronic advertising and promotion of prostitution.

9.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, the evidence of illegal activity described above in paragraphs "a" through "e" is maintained by individuals involved in illicit commercial sex in property that they and their associates live in and operate as well as on online accounts such as Snapchat, Instagram, and Facebook as well as email accounts, which can be accessed on computers and cellular telephones.

## JURISDICTION

10.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§

2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND INFORMATION ON INSTAGRAM[1]

11.     Instagram is a service owned by Meta, a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510.  Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the target accounts listed in Attachments A-1 and A-2, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

12.     Meta collects basic contact and personal identifying information from users during the Instagram registration process.  This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers.  Meta keeps records of changes made to this information.

13.     Meta also collects and retains information about how each user accesses and uses Instagram.  This includes information about the Internet Protocol ("IP") addresses[2] used to create and use an account, unique identifiers and other

---

[1] The information in this section is based on information published by Meta on its Instagram website, including, but not limited to, the following webpages: "Data Policy," https://help.instagram.com/519522125107875; "Information for Law Enforcement," https://help.instagram.com/494561080557017; and "Help Center," https://help.instagram.com.

[2] An IP address is expressed as groups of numbers separated by decimal points and is unique to a particular device during an online session.  The IP address can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different number to a device every time it accesses the Internet.  IP addresses might also be

information about devices and web browsers used to access an account, and session times and durations.

14.     Each Instagram account is identified by a unique username chosen by the user.  Users can change their usernames whenever they choose but no two users can have the same usernames at the same time.  Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

15.     Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account.  Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality.  For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account or transfer an image from Instagram to a connected image printing service.  Meta maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

16.     Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers).  Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments.  Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

---

static, if an ISP assigns a user's device a particular IP address, which is used each time the device accesses the Internet.

17.   Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users.   Meta retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions.   Users can similarly allow Meta to search an associated Facebook account for friends who are also Instagram users.   Users can also manually search for friends or associates.

18.   Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings.   Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

19.   One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos.   Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location. These appear as posts on the user's profile.   Users can remove posts from their profiles by deleting or archiving them.   Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

20.   Users can interact with posts by liking them, adding, or replying to comments, or sharing them within or outside of Instagram.   Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@").   An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

21.   An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours.   Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted.   The usernames

of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

22.    Instagram allows users to broadcast live video from their profiles. Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

23.    Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups.  These messages may include text, photos, videos, posts, videos, profiles, and other information.  Participants to a group conversation can name the group and send invitations to others to join. Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings.  Senders cannot view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot.  Instagram Direct also enables users to video chat with each other directly or in groups.

24.    Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps.  Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

25.    Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag. Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram.  Meta retains records of a user's search history and followed hashtags.

26.     Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

27.     Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content.  Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers.  This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

28.     In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

29.     For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

## FACTS IN SUPPORT OF PROBABLE CAUSE

30.     On December 16, 2021, an individual, later identified as Keenon GREEN, using the Instagram[3] handle "djokovic_11" (**Target Account #1**) and display name "not a pimp just lost in the 🌐" contacted a law enforcement officer with the San Diego Sheriff's Office (SDSO) (the "UC") via direct message to the

---

[3] As noted above, the Instagram application allows users to post video stories, and the UC viewed Green's "stories" the weekend prior to GREEN messaging the UC on December 16, 2021.

UC's undercover Instagram account.  The UC's undercover Instagram account profile displays fourteen photographs showing seven photographs of a young female in lingerie and/or skimpy clothing, two photographs displaying several $100 dollar bills, and other photographs showing high heels and discarded lingerie.

31.    Between December 16, 2021, and January 14, 2022, the UC communicated with GREEN, first via Instagram direct messaging using the Instagram handle "Lexxmiche" and moniker "Lex" and subsequently via cellular telephone text message.  On December 27, 2021, GREEN sent Lex a DM stating that his name is "Keenon."

32.    On January 4, 2022, GREEN sent UC a video of an unknown male and female who appear in a video montage traveling, wearing fancy clothing, and flashing large amounts of money and followed up with a DM stating, "This way I'm on", then adding, "Maybe if you on the same page we can link up and have an authentic conversation."

33.    During the subsequent exchange, the UC informed GREEN that she is in high school and is sixteen (16) years old.  Immediately after receiving this message, GREEN sent the UC a DM with a cellular telephone number (858) 269-9760 and told her to text him at that number.  This phone number was run through law enforcement databases and was found to be registered to Keenon GREEN, with a residential address in Chula Vista, California, within the Southern District of California.  Over the course of their conversation, GREEN attempted to entice and recruit the UC's 16-year-old undercover persona to work as a prostitute for him.  Outlined below are excerpts from the Instagram and text conversation between GREEN and the UC as "Lex" on January 4, 2022, and January 5, 2022:

//
//
//
//

| "Lex" | What are ur rules[4]? |
|---|---|
| GREEN | I have no rules like I'm not a weirdo just ask that you give your all wen it's time to work I'm really not the type of person to trip off shit just be real with me and tell me when your not happy or if I'm doing something that makes you feel uncomfortable |

| GREEN | Like at the end of the day I want what we do as a way of making money not to be who you are like 304in[5] is what you do it's not who you are your a women at the end of the day and I would treat you accordingly |
|---|---|
| "Lex" | So no choose up?[6] |
| GREEN | I mean a female like you I know wat we can do choose up fees I personally feel are for broke Niggas that want the bitch to bring some money to the table so they dont have to spend they own and take a risk… |

| GREEN | So you wasn't feeling how I move? |
|---|---|
| "Lex" | I was busy with school work |
| GREEN | Nah that's understandable if you don't mind what do you go to school for??? |

[4] Since February 2022, I have been assigned to the San Diego Human Trafficking Task Force (SDHTTF) where I have participated in investigations involving the exploitation of children and adults for illicit commercial sex activity, human trafficking, forced labor, various illegal activity of criminal gang members and have performed a variety of related investigative tasks.  Based on my training and experience, I know that pimps/traffickers tend to have specific rules regarding how they operate and what they expect from the prostitutes/ sex workers that work for them.

[5] Based on my training and experience, I know that "304" is a slang term for a prostitute. "304" read upside-down on a calculator appears as the letters "hoe."

[6] Based on my training and experience, I know that "choose up" is the process by which a pimp takes "ownership" of a prostitute/sex worker.

| GREEN | That's so dope that you actually have a plan and your not just trying to trap[7] your whole life |
|---|---|
| "Lex" | I was doing my biology hw |
| GREEN | You into the human anatomy? |
| GREEN | I in high school? |
| GREEN | You |
| "Lex" | Yeah I'm finishing it up online |
| GREEN | How old are you? |
| "Lex" | 16? |
| GREEN | Are you fr call me I have to holla at you fr 858-269-9760 |
| GREEN | Text my number |
| GREEN | When you get the chance |

34.   On January 5, 2022, the UC began a text message conversation with GREEN using the phone number that he provided.  The following is an excerpt of the conversation:

| "Lex" | Hey its lex. I cant talk on the phone rn but I can text |
|---|---|
| GREEN | Naw it's all good |
| GREEN | How's biology |
| "Lex" | Boring |
| "Lex" | Listen I aint into small talk lol |
| GREEN | Say no more well when can u come pull up on you |
| GREEN | I'll explain the whole process in person |
| GREEN | Well lmk im ready when you are Frfr |
| "Lex" | Before we meet im just curious how you can help me. I aint trying to meet up with you if you arent gonna benefit me also |

---

[7] Based on my training and experience, I know that "Trap" is slang terminology that refers to money earned through prostitution.

| "Lex" | I know you said as long as im comfortable. I just aint trying to get snatched on the blade[8] if thats what you have your girls do lol |
|---|---|
| GREEN | Okay well I'm going to do everything in my power to keep you happy in every way shape and or form im not into breaking girls down im into building them up honestly you'd prolly only work the blade for a week max my potna got line on the fake Id then you can get on the real site charge 350 a hour and only be in there 30 mins max umm like I said I want the best for you teach you how to drive if you don't know how already get you a car so you can be independent |
| GREEN | Like I have a plan that will work if your willing to put forth the effort |
| GREEN | Ps I would never let anything happen to you on the blade while your working that's out, I'll really pop a nigga behind mine |
| "Lex" | Do you have like a minimum number of dates a night? |
| GREEN | 500 usually |
| GREEN | Not dates |
| GREEN | Money |
| GREEN | Outta town it's 1000 |
| "Lex" | For sure I can fuck with that |
| GREEN | Yhap it's really good we can really make somethings happen if your serious and if your serious when do you want to start? |
| GREEN | …… |
| "Lex" | I cant always be on my phone. I got a few dates this weekend with some of my regulars. Maybe we can meet up and talk after the weekend? |
| GREEN | Sounds perfect stay safe ttyl hit me if u need me |

---

[8] Based on my training and experience, I know that "blade" is a slang term that refers to an area of town where prostitutes/sex workers solicit sex-buyers.

35.     Based upon my training and experience, as well as my discussions with other law enforcement officers experienced in human trafficking investigations, I know that the language used by GREEN in the above Instagram and telephone exchange is indicative of an individual attempting to recruit, persuade, induce, or entice an individual whom he believes has not attained the age of 18 to engage in prostitution.  For example, GREEN's statement, "I want what we do as a way of making money not to be who you are like 304in is what you do it's not who you are" refers to prostitution being a means to an end for them and not defining who they are as people.  GREEN also states, "female like you I know wat we can do choose up fees I personally feel are for broke Niggas."  Based on my training and experience, I know that a "choose up" fee is a specific amount of money that a prostitute/sex worker pays a pimp/trafficker to work under them.  Additionally, GREEN responds to Lex when she states she is currently in school: "That's so dope that you actually have a plan and you're not trying to trap your whole life."  Based on my training and experience, I know that "trap" in this context refers to earning money through prostitution.  In another exchange, "Lex" expresses concern that she might be harmed if she was on the blade.  GREEN responds, "honestly you'd prolly only work the blade for a week max my potna got line on the fake Id then you can get on the real site."  The "blade" in this context refers to street-based prostitution and GREEN states that "Lex" would only do that for about a week until his partner gets her a fake identification allowing her to post online sex advertisements.

36.     Based on these statements, along with the other messages exchanged during the conversation, I believe that GREEN, beginning on or about January 4, 2022, did knowingly attempt to recruit, persuade, induce, and entice an individual whom he believed had not attained the age of 18 to engage in prostitution.

37.     On January 14, 2022, GREEN and the UC exchanged messages regarding GREEN coming to meet the UC.  The UC provided the address of Mast

Park located in Santee, California.  At approximately 1:45 pm, GREEN arrived at the location.  TFOs conducting surveillance observed GREEN drive into the parking lot, where he was stopped and placed under arrest.  Shortly afterward, a post-arrest call was placed to the phone number the UC was using to communicate with GREEN, and his red Apple iPhone began to ring with the contact name "Lex." GREEN was transported to the San Diego Sheriff's substation located in Santee, California, where he was advised of his *Miranda* rights.  GREEN acknowledged and waived his rights, agreeing to answer questions without the presence of an attorney.  GREEN admitted that he went to the park to pick up "Lex," a female he believed to be 16 years old, for the purpose of prostitution.

38.     During the post-Miranda interview, GREEN stated that he first got involved in recruiting and trafficking women for commercial sex when he was 18 years old.  At one point in the interview GREEN stated, "I live off the earnings of a prostitute."  GREEN identified an additional IG account of his as "wtgfrfr_11" (**Target Account #2**).

39.     Following his arrest, a forensic search was conducted of GREEN's red Apple iPhone pursuant to a federal search warrant identified as 22mj0182-DEB.  A review of the data downloaded from that phone showed IG messages sent by owner "im Broke Baby" from **Target Account #2**.  In an exchange that he initiates with an IG user identified as "Kali Ma" on January 8, 2022, GREEN identifies himself as the user of **Target Account #2** in the following exchange:

| "im Broke Baby" | Your from San Diego where do they hide your kind at |
|---|---|
| "Kali Ma" | Lol they ran out |
| "im Broke Baby" | I've been in fashion valley for the past two months |
| "im Broke Baby" | Your type really are scarce |
| "Kali Ma" | Foreal ?  Well I'm probably. Flying back tomorrow |
| "im Broke Baby" | That's what's up I'm keenon by the way? |

40.    Also on January 8, 2022, GREEN used **Target Account #2** sent a video message (the content could not be recovered from the phone) to an IG user identified as "snoCAKES" and the following exchange occurred in which they discussed prostitution activity:

| snoCAKES | Said who lmao |
| GREEN | If you happy just tell me to leave you alone and I'm gone |
| GREEN | I'm trying to get to this money Frfr if you trying to lmk if not lmk |
| snoCAKES | [picture] (content unknown) |
| snoCAKES | 1700 off one trick |

41.    In another IG message on January 8, 2022, GREEN explained to IG user "UPDATER" why he was now using **Target Account #2**:

| GREEN | Sup wit blood this my new gram that other one got fucked over by this faggot ass bitch but it was lowkey my fault not logging out the trap phone… |

42.    Based on my training and experience, and consultation with law enforcement agents who have training and experience investigating sex trafficking offenses, I know that individuals will often utilize multiple social media accounts to communicate with customers and individuals involved in prostitution. Similarly, multiple social media accounts are commonly used to contact minors and adults to persuade and induce them into engaging in sex trafficking by communicating using Instagram as described above.  Based on the facts of this case, I believe that evidence of sex trafficking crimes may be found on both of the **Target Accounts**.  Additionally, the search of the **Target Accounts** may also identify other individuals engaged in sex trafficking.

//

//

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

43.     Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation.  The personnel of Meta (hereinafter "the internet service provider" or "the ISP") are not.  It would be inappropriate and impractical for federal agents to search the vast computer network of the ISP for the relevant accounts and then to analyze the contents of those accounts on the premises of the ISP.  The impact on the ISP's business would be severe.

44.     Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the **Target Accounts**, as described in Attachments B-1 and B-2.  In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of the ISP, to protect the privacy of the ISP's subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, Homeland Security Investigations seeks authorization to allow the ISP to make digital copies of the entire contents of the accounts subject to seizure.  The copies will be provided to me or to any authorized federal agent.  The copies will be imaged, and the images will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachments B-1 and B-2.  Relevant electronic records will be copied to separate media.  The original media will be sealed and maintained to establish authenticity, if necessary.

45.     Analyzing the data to be provided by the ISP may require special technical skills, equipment, and software.  It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant "hit" does not end the review process.  Keyword searches do not capture misspelled words, reveal

the use of coded language, or account for slang.  Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches.  Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. The ISP does not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

46.    Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months.  Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachments B-1 and B-2. The personnel conducting the examination will complete the analysis and within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

47.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic communications that identify any users of the subject account(s) and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

48.    All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification, segregation, and extraction of data within the scope of this warrant.

**GENUINE RISK OF DESTRUCTION OF EVIDENCE**

49.     Based upon my experience and training, and the experience and training of other detectives with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills.  In this case, only if the subject receives advance warning of the execution of this warrant, will there be a genuine risk of destruction of evidence.  In addition, preservation requests were sent to Facebook ordering the preservation of data associated with the **Target Accounts**.  The **Target Accounts** were originally preserved in January of 2022.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

50.     Outside of what is outlined above, the United States has not attempted to obtain this data by other means.

**CONCLUSION**

51.     Based on the foregoing, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 1591 and 2422, as described in Attachments B-1 and B-2, are likely to be found in the property to be searched, as described in Attachments A-1 and A-2.

Aron Marcellus
Special Agent
Homeland Security Investigations

Subscribed and sworn before me this ____3rd____ day of June 2022.

HONORABLE MICHAEL S. BERG
United States Magistrate Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Attachment A-1

### *Property to be Searched*

This warrant applies to information associated with the following Instagram user Account, used by Keenon GREEN:

    a.  djokovic_11

       ("**Target Account #1**")

**Target Account #1** is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered at 1601 Willow Road, Menlo Park, California.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Attachment B-1

### *Particular Things to be Seized*

**I.   Information to be disclosed by Meta Platforms, Inc. ("Meta")**

   To the extent that the information described in Attachment A-1 is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or other information that has been deleted but is still available to Meta, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each account or identifier listed in Attachment A-1:

  A. All business records and subscriber information, in any form kept, pertaining to the account, from November 14, 2021 through January 14, 2022, including:

    1. Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

    2. All Instagram usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts (including those linked by machine cookie), and all records or other information about connections with Facebook, third-party websites, and mobile apps (whether active, expired, or removed);

    3. Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

4. Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

5. All advertising information, including advertising IDs, ad activity, and ad topic preferences;

6. Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers;

7. Privacy and account settings, including change history; and

8. Communications between Meta and any person regarding the account, including contacts with support services and records of actions taken;

B. All content (whether created, uploaded, or shared by or with the account), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata, from November 14, 2021 through January 14, 2022;

C. All content, records, and other information relating to communications sent from or received by the account from November 14, 2021 through January 14, 2022, including but not limited to:

1. The content of all communications sent from or received by the account, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

2. All records and other information about direct, group, and disappearing messages sent from or received by the account, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

3. All records and other information about group conversations and video chats, including dates and times, durations,

invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

4.       All associated logs and metadata;

D.   All content, records, and other information relating to all other interactions between the account and other Instagram users from November 14, 2021 through January 14, 2022, including but not limited to:

1.       Interactions by other Instagram users with the account or its content, including posts, comments, likes, tags, follows (including unfollows, approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

2.       All users the account has followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

3.       All contacts and related sync information; and

4.       All associated logs and metadata;

E.   All records of searches performed by the account from November 14, 2021 through January 14, 2022; and

F.   All location information, including location history, login activity, information geotags, and related metadata from November 14, 2021 through January 14, 2022.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.   Search and Seizure of Information by the Government

The search of the data supplied by the ISP pursuant to this warrant will be conducted by the San Diego Human Trafficking Task Force (SDHTTF) as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited from November 14, 2021 through January 14, 2022. Agents will seize information described above in Section II that constitutes fruits, evidence,

or instrumentalities of violations of 18 USC §1591 (Sex Trafficking of Children or by Force, Fraud or Coercion) and 18 U.S.C §2422 (Attempted Enticement of a Minor), for the user ID identified on Attachment A-1, information pertaining to the following matters:

a.   Communications, logs, photos, postings, "likes," activity, and records tending to discuss or establish the sexual exploitation of children or by force, fraud, or coercion; or efforts to recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, or solicit a person who has not attained the age of 18 years to engage in a commercial sex act;

b.   Electronic mail, text or instant messages, communication, chats, posts, profile information, subscriber information, or attachments tending to discuss or establish the sexual exploitation of children; or efforts to recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, or solicit a person who has not attained the age of 18 years to engage in a commercial sex act;

c.   Communications, logs, photos, postings, "likes," activity, and records tending to identify the user of the account and any co-conspirators involved in the illegal activities described in the affidavit;

d.   Communications, logs, photos, postings, "likes," activity, and records that provide context to any communications described above, such as but not limited to electronic messages sent or received in temporal proximity to any relevant electronic messages and any electronic messages tending to identify users of the subject account;

e.   Evidence indicating how and when the Instagram account was accessed or used, to determine context (e.g., chronological, geographic, etc.) of account access, use, and events relating to the crimes under investigation and to the Instagram account owner/user;

f.   Evidence indicating the Instagram account owner's state of mind as it relates to the crime under investigation;

g.   The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).